UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,  )  | |
| )  | |
| Plaintiff,  )  | |
| )  | |
| v.  )  | Civil Action No. _____ |
| )  | |
| $396,589 IN U.S. FUNDS ASSOCIATED  )  | |
| WITH ROYAL PEARLS GENERAL  )  | |
| TRADING  )  | |
| )  | |
| Defendant.  )  | |
| )  | |

**VERIFIED COMPLAINT
FOR FORFEITURE _IN REM_**

COMES NOW, Plaintiff the United States of America, by and through the United States Attorney for the District of Columbia, brings this verified complaint for forfeiture in a civil action _in rem_ against the defendant property, namely: $396,589.00 in U.S. funds associated with Royal Pearls General Trading (the "Defendant Funds"), and alleges as follows:

**NATURE OF ACTION AND THE DEFENDANT IN REM**

1.      This _in rem_ forfeiture action arises out of an investigation by the Federal Bureau of Investigation ("FBI") of a scheme by Premium Technology Petroleum Services ("PT Petro"), Royal Pearls General Trading ("Royal Pearls"), MKS International Group ("MKS"), Kambiz Rostamian ("Rostamian"), and their co-conspirators to obtain specialized petroleum parts from a U.S. manufacturer and illegally export those parts, through the use of false shipper export documents ("SED") to end users in the Republic of Iran ("Iran") in violation of the Export Administration Regulations, as authorized by the Export Administration Act of 1979; the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 _et seq_; and the federal money laundering statutes, codified at 18 U.S.C. §§ 1956(a)(2)(A), (h).

2.    The Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) as property constituting or derived from proceeds traceable to violations of IEEPA.  In addition, the Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in, and traceable to money laundering violations, in violation of 18 U.S.C. §§ 1956(a)(2)(A), (h).

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

4.    Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because the acts and omissions giving rise to the forfeiture took place in the District of Columbia.  The Defendant Funds are currently held in a bank account in the United States.  The coconspirators failed to seek licenses from the Office of Foreign Asset Controls ("OFAC"), which is located in Washington, D.C., for conducting transactions with these funds in violation of United States law.

## STATUTORY FRAMEWORK

**I.     THE EXPORT ADMINISTRATION REGULATIONS**

5.    The United States Department of Commerce, which is located in Washington, D.C., has the authority to prohibit or curtail the export of goods and technologies from the United States to foreign countries in order to protect, among other things, the national security and foreign policy of the United States.

6.    The Department of Commerce implemented that authority through the Export Administration Regulations ("EAR"), which restrict the export of certain goods and technologies unless authorized by the Department of Commerce through issuance of a valid export license by its Bureau of Industry and Security.

7.    The EAR further prohibit any transaction designed to evade or avoid, or which has the purpose of evading or avoiding, said regulations, including the making of false or misleading

statements or concealing a material fact in the course of the submission of documents relating to an export of goods or technologies.

8.      The EAR place requirements on exporters and include a list of products, commodities, and items for which an export license is required.  *See* 15 C.F.R. § 744.

9.      Whether an item requires an export license depends in part on what country the item is being exported to, who the end-user of the item is, and what the end-user intends to use the item for.  The EAR expressly requires a license applicant to disclose the names and addresses of all parties to a transaction, including the applicant, purchaser, intermediate consignee(s) (if any), ultimate consignee, and end-user.  *See* 15 C.F.R. §§ 748.4(b), 748.5.  Certain applications must be supported by documents designed to elicit information concerning the disposition of the items intended for export.  *See* 15 C.F.R. § 748.9(b).

10.     The EAR's authorizing statute, the Export Administration Act of 1979 ("EAA"), codified at 50 U.S.C. App. 2401-20, expired in August 1994, and was reauthorized by Public Law 106-508, signed on November 13, 2000.  The EAA lapsed again on August 20, 2001, but the Regulations have continued in full force and effect through periodic reauthorizations and successive invocations of IEEPA (see below).  On August 17, 2001, President George W. Bush issued Executive Order ("EO") 13222, in which he ordered that all provisions of the EAR "remain in full force and effect" under the IEEPA authority.  EO 13222 has been extended by successive Presidential Notices.

11.     To violate, attempt to violate, or conspire to violate any portion of the EAR is a felony punishable by up to 20 years imprisonment under IEEPA.  *See* 50 U.S.C. § 1705.

12.     The EAR makes it unlawful to engage in any conduct prohibited by, or contrary to, or to refrain from engaging in any conduct required by, the EAR.  It is also unlawful to violate any

order, license or authorization issued thereunder, and equally unlawful to cause, aid, abet, solicit, attempt, or conspire to commit a violation of the EAR, or any order, license, or authorization issued thereunder.

13.     The EAR prohibit the ordering, buying, removing, concealing, storing, use, sale, loan, disposition, transfer, transport, financing, forwarding, or other servicing, in whole or in part, of any item exported or to be exported from the United States, that is subject to the EAR, with knowledge that a violation of the EAR, or any order, license, or authorization issued thereunder, has occurred.  *See* 15 C.F.R. § 764.2(a)-(e).

14.     Finally, pursuant to the EAR, it is unlawful to engage in any transaction or take any other action with intent to evade the provisions of the EAR, or any order, license, or authorization issued thereunder.  *See* 15 C.F.R. § 764.2(h).

## II.     THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT AND IRANIAN SANCTIONS

15.     The International Emergency Economic Powers Act, codified at 50 U.S.C. § 1701 *et seq*, gives the President certain powers, defined in Section 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations thereunder.  *See* 50 U.S.C. § 1705(a).  A conspiracy to violate IEEPA is prohibited by 18 U.S.C. § 371.

16.     On March 15, 1995, the President issued EO 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat."  EO 12957 was expanded and continued by EOs 12959 and 13059, and was in effect at all times relevant to this complaint.  These EO's imposed economic sanctions, including a trade embargo, on Iran and prohibited, among other things, the exportation, re-

exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person.  They also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

17.     Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations ("ITR"), 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.  In October 2012, the ITR was renamed without substantive changes and republished as the Iranian Transactions and Sanctions Regulations or "ITSR."

18.     The ITSR prohibited, among other things, the export, re-export, sale, or supply, directly or indirectly, of any goods, technology, or services from the United States or by a United States person, wherever located, to Iran or the Government of Iran, without prior authorization or license from the United States Department of the Treasury, through OFAC.  These regulations further prohibited any transactions that evade or avoid or have the purpose of evading or avoiding any of the prohibitions contained in the ITSR, including the unauthorized exportation of goods from the United States to a third country if the goods are intended or destined for Iran.  *See* 15 CFR §§ 560.201, 560.203, 560.204, 560.205, and 560.206.

19.     Criminal violations of the ITSR are enumerated by the criminal penalty statutes of IEEPA, 50 U.S.C. §§ 1701-05.

## III.     MONEY LAUNDERING

20.     Pursuant to 18 U.S.C. § 1956(a)(2)(A) (the international promotional money laundering statute) it is a violation to transport, transmit, and transfer, and attempting to transport, transmit, and transfer a monetary instrument or funds, *inter alia*, to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity.

21.     Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes a violation of IEEPA.

22.     Pursuant to 18 U.S.C. § 1956(h), it is a violation to conspire to violate Section 1956.

IV.     **FORFEITURE**

23.     Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of IEEPA is subject to forfeiture.

24.     Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to civil forfeiture.

## FACTS GIVING RISE TO FORFEITURE

I.      **PT Petro Background**

25.     PT Petro claims to be a petroleum service company based in Egypt.  The PT Petro website states that the company provides data processing and consultation services, data acquisition systems, and equipment engineering and procurement services.  The website further states that the company was established in 2011 to focus on Middle Eastern oil and gas sector markets.

26.     The PT Petro website shows a physical address for operations in Cairo, Egypt. However, the address is in a residential area with small businesses scattered throughout the block.

II.     **Purchase Order 40008**

27.     On March 6, 2014, PT Petro issued Purchase Order 40008 to U.S. Company 1 to purchase the following parts: 11 reels of QT700 Coiled Tubing, 8 reels of QT800 Coiled Tubing, and related accessories.  The total purchase price of these parts was $1,112,885.00 in U.S. funds. QT700 and QT800 coiled tubing products are highly specialized pieces of equipment used by large scale petroleum operations.

28.     According to the payment terms of Purchase Order 40008, PT Petro was required to pay 30% of the total purchase price in advance and the full amount of each item prior to shipment.

29.     On July 15, 2014, PT Petro wired $333,662.50 in U.S. dollars from a bank in Egypt, to U.S. Company 1's bank account in the United States as advance payment for Purchase Order 40008.  These funds, which were subsequently seized by law enforcement pursuant to a seizure warrant, represent a portion of the Defendant Funds.

30.     On or about April 1, 2015, U.S. Company 1 and PT Petro coordinated a partial shipment of some of the items from Purchase Order 40008, including five reels of QT700 coiled tubing and two reels of QT800 coiled tubing.  On April 7, 2015, PT Petro wired an additional $62,926.50 in U.S. funds from a bank in Qatar to U.S. Company 1's bank account in the United States.  These funds, which were subsequently seized by law enforcement pursuant to a seizure warrant, represent the remaining portion of the Defendant Funds.

31.     The combined total of the July 15 and April 7 wires is $396,589.00 in U.S. funds, which represents the Defendant Funds.

**III.     PT Petro Ties to Royal Pearls**

32.     In early 2015, PT Petro submitted a U.S. Export Control Law Compliance form in preparation to receive the shipment of the above identified parts.  On this form, PT Petro stated that the destination country for the items was Egypt.

33.     However, PT Petro subsequently requested that U.S. Company 1 ship the five reels of QT700 coiled tubing and two reels of QT800 coiled tubing to Royal Pearls at a P.O. Box in Dubai, UAE, instead of the original destination in Egypt.

34.     Pursuant to United States law and regulation, exporters and shippers or freight forwarders are required to file certain forms and declarations with the Department of Homeland

Security concerning exports of goods and technology from the United States. Typically, those filings are completed through the submission of a Shipper's Export Declaration ("SED") or the submission of Electronic Export Information ("EEI") via the Automated Export System administered by Customs and Border Protection. Exporters, shippers, and freight forwarders are required to file an SED or EEI for every export of goods or technology from the United States with a value of $2,500 or more. An SED or EEI is also required regardless of the value of the goods or technology if the goods or technology require an export license.

35.     A search of prior official export records related to PT Petro revealed only two other exports from the United States, both involving purchases from U.S. Company 1.

36.     The first shipment, dated August 19, 2013, was for coiled tubing, valued at $139,532, and listed PT Petro as the ultimate consignee.

37.     The second shipment, dated August 15, 2014, was for "pressure-reducing valves hydraulic fluid power type," valued at $73,000, and listed PT Petro as the intermediate consignee and Royal Pearls as the ultimate consignee.

38.     The products shipped in these two transactions are highly specialized pieces of equipment used in the petroleum industry.

**IV.     Royal Pearls Background and Ties to Iran and Rostamian**

39.     Royal Pearls claims to be a laboratory equipment trading company based in Dubai, UAE. The Royal Pearls website states that the company, referred to as both "Royal Pearl Chemical" and "Royal Pearls General Trading," supplies laboratory equipment to universities, research institutes, and medical laboratories in Afghanistan, Armenia, Tajikistan, Iraq, Lebanon, and other countries through numerous different suppliers and manufacturers located in the United States, United Kingdom, Germany, Norway, and Japan.

40.     The specialized petroleum parts directed to Royal Pearls from PT Petro described above were not laboratory equipment and have no apparent use in the supply chain described by Royal Pearls.

41.     The registrant and administrator information for the current Royal Pearls website shows the following address: "4th Floor, N014 Tehran, **Tehran, IR** 19937, Dubai, AE 1116" (emphasis added).  This address does not exist in the UAE.  This false address was an attempt by the registrant to make an Iranian address appear to be located in the UAE.

42.     Royal Pearls previously used a different website.  This prior website became inactive in 2015 and currently shows no content; however, a cached version of the website -- a cached version of a website is a snapshot or copy of a website that is stored as a back-up.  Several different publicly available websites allow users to view cached versions of websites from different periods in time, whether or not the website is still active -- shows content that essentially matches the current Royal Pearls website.  The website is currently registered to Rostamian, who was identified in the above designation as being the CEO of Royal Pearls.

43.     The IP login information associated with Rostamian's email account shows that he logged in from Tehran, Iran, on multiple occasions throughout 2016.

44.     Rostamian has made several statements that he owns Royal Pearls.  For example, in a visa application, Rostamian stated that he is an owner and manager of Royal Pearls.

45.     In addition, Rostamian has claimed to be the CEO and Director of MKS, which is also located in Iran.

46.     On February 3, 2017, the Department of Treasury Office of Foreign Assets Control designated Royal Pearls, MKS International, and Rostamian as "Specially Designated Nationals" (or "SDNs") of Iran.  The designation states:

[Aerospace Industries Organization] AIO is the Iranian organization responsible for ballistic missile research, development, and production activities and organization, including [Shahid Hemmat Industrial Group] SHIG and the Shahid Bakeri Industries Group (SBIG).  AIO, SHIG, and SBIG were identified in the Annex of E.O. 13382 in June 2005.

…

MKS International is being designated for providing financial, material, technological, or other support to AIO and SBIG.  Since 2011, MKS International has been involved in procuring controlled and other technology and materials to support Iran's ballistic missile programs, primarily for AIO and SBIG.  MKS International utilized multiple front companies in order to circumvent export laws and sanctions.

Kambiz Rostamian is MKS International's CEO and is being designated for acting for or on behalf of MKS International and Royal Pearl General Trading.  He has dealt directly with and received payments from AIO for the procurement of goods. Rostamian has also acted as a direct intermediary to purchase parts through MKS.

Rostamian is also CEO of Royal Pearl General Trading, which is being designated for acting for or on behalf of MKS International. Royal Pearl General Trading is a front company for MKS International that has worked with SBIG and AIO to procure components for Iran's ballistic missile program.

## V.     MKS Is the End User for the Petroleum Parts Order

47.     MKS claims to be a trading company based in Tehran, Iran.  The MKS website, which is owned by Rostamian, states that the company was founded in 1978, and that it represents more than 50 manufacturers across the globe in the following sectors: Automotive, Engineering, Environmental, Laboratory & Medical, Nano, Raw Material and Energy (Renewable & Fossil Sectors).  According to the website, each of these sectors is supported by a separate MKS subsidiary.

48. The MKS website has had links to the MKS Energy website, which is also owned by Rostamian. The MKS Energy website has also listed a contact address for the company located in Tehran, Iran.

49. The MKS Energy website publicly advertises "Coiled Tubing, Down Hole Tools" and "Coiled Tubing Reel" services in the Upstream Products of their Fossil Fuel Energy division. In addition, the website has the following detailed description of tubing as part of the fossil fuel acquisition process:

> Tubing is the conduit through which oil and gas are brought from the producing formations to the field surface facilities for processing. Tubing must be adequately strong to resist loads and deformations associated with production and workovers. Further, tubing must be sized to support the expected rates of production of oil and gas. Clearly, tubing that is too small restricts production and subsequent economic performance of the well. Tubing that is too large, however, may have an economic impact beyond the cost of the tubing string itself because the tubing size will influence the overall casing design of the well.

50. The services offered and descriptions provided match the type of coiled tubing purchased by PT Petro from U.S. Company 1 in Purchase Order 40008.

## VI. Summary of Facts Giving Rise to Forfeiture

51. In sum, the investigation of PT Petro (purportedly based in Egypt) and Royal Pearls (purportedly based in UAE) has revealed that neither company has the capability to use the specialized petroleum parts that was purchased from U.S. Company 1 in Purchase Order 40008.

52. As such, both PT Petro and Royal Pearls falsified shipper export documents when stating the end user of the petroleum parts. Additionally, the revised nominal end user, Royal Pearls, is owned by the designated, Iranian national Kambiz Rostamian.

53. Rostamian also owns several other trading companies, including MKS and its subsidiary, MKS Energy, which are based in Iran.

54.     Further investigation has revealed that MKS Energy publicly lists for re-sale the same petroleum parts identified above.

55.     Sanctions against Iran make it illegal for Iranian companies, such as MKS, to acquire many U.S. origin products, including the types of petroleum parts acquired from U.S. Company 1, without an OFAC license.

56.     Based on the foregoing, the co-conspirators have used front companies to procure U.S. origin products for MKS, an Iranian company that is now designated, in violation of United States laws.

## COUNT ONE -- FORFEITURE
### (18 U.S.C. § 981(A)(1)(C))

57.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 56 above as if fully set forth herein.

58.     PT Petro, Royal Pearls, MKS, Rostamian, and others, known and unknown, acted individually and conspired together to conduct the above identified illegal procurements, payments, and exports, in violation of IEEPA, specifically 50 U.S.C. § 1705; and the conspiracy statute, 18 U.S.C. § 371.

59.     As such, the Defendant Funds are subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to a conspiracy to violate IEEPA.

## COUNT TWO -- FORFEITURE
### (18 U.S.C. § 981(A)(1)(A))

60.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 56 above as if fully set forth herein.

61.     PT Petro, Royal Pearls, MKS, Rostamian, and others, known and unknown, acted individually and conspired together to transmit and transfer the Defendant Funds to a place inside

the United States from or through a place outside the United States, with the intent to promote the carrying on of violations of the IEEPA, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(2)(A).

62.     As such, the Defendant Funds are subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in transactions in violation of 18 U.S.C. §§ 1956(h), 1956(a)(2)(A), or as any property traceable to such property.

*     *     *

## **PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays that notice issue on the Defendant Funds as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that a warrant of arrest *in rem* issue according to law; that judgment be entered declaring that the Defendant Funds be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: March  31, 2017
　　　Washington, D.C.

Respectfully submitted,

CHANNING D. PHILLIPS,
United States Attorney

By:　Kyle T. Bateman
　　　Special Assistant United States Attorney
　　　Zia M. Faruqui
　　　Ari Redbord
　　　Brian Hudak
　　　Assistant United States Attorneys
　　　555 Fourth Street, NW
　　　Washington, DC 20530
　　　(202) 252-7566 (main line)

　　　*Attorneys for the United States of America*

## **VERIFICATION**

I, Rick Crouse, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this <u>31st</u> day of March, 2017.


_____ */s/ Katherine Tenaglia* _____ _
Katherine Tenaglia
Special Agent
Federal Bureau of Investigation